AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| Leeroy Leon | ) | 19-MJ-076-SMM |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

> FILED BY _____ D.C.
>
> **JUL 2 9 2019**
>
> ANGELA E. NOBLE
> CLERK U.S. DIST. CT.
> S. D. OF FLA. - FT. PIERCE

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___3/1/19; 3/14/19; 4/4/19; 4/10/19___ in the county of ___Saint Lucie___ in the ___Southern___ District of ___Florida___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). | Distribution of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance. |

This criminal complaint is based on these facts:

See Attached Affidavit of DEA Special Agent Randy Matschner.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

DEA Special Agent Randy Matschner
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___07/29/2019___

_____
*Judge's signature*

City and state: ___Fort Pierce, Florida___   Shaniek M. Maynard, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF FLORIDA

**AFFIDAVIT IN SUPPORT OF
CRIMINAL COMPLAINT**

I, Special Agent Randy Matschner, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent of the Drug Enforcement Administration ("DEA"), and have been so employed for the past sixteen years. I am currently assigned to the Port St. Lucie Resident Office in Port St. Lucie, Florida. Prior to my employment with the DEA, I was a Police Officer and Narcotics Agent for the City of Palm Bay, Brevard County (Florida) for approximately 7 years. During my time with the DEA, I have been the case agent or co-case agent in investigations involving narcotics, currency violations, and other violations enforced by Title 18 and Title 21 of the United States Code. I have received extensive training in conducting these investigations and in identifying the means and methods used by narcotics traffickers.

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7). I am empowered by law to conduct investigations of, and to make arrests for, among other things, offenses enumerated in Title 21, United States Code, Sections 841, 843, and 846.

3. The facts contained in this Affidavit are based on my personal knowledge, as well as information relayed to me by other law enforcement personnel involved in this investigation. This Affidavit is being submitted for the sole purpose of establishing probable cause that Leeroy LEON ("LEON") knowingly and intentionally distributed cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C), as

set forth herein.  This Affidavit therefore does not contain every fact known to me regarding this investigation.

## PROBABLE CAUSE

4.    On February 26, 2019, your Affiant, FBI/TFO Bolonka, Detective Favale, and Detective Cuevas met with a cooperating defendant, Juan MATA.  MATA advised that he was able to purchase anywhere from one ounce to five kilograms of cocaine from LEON.  MATA placed a controlled and recorded telephone call to LEON for the purpose of making a future purchase of cocaine from LEON.  The call was monitored and the number dialed was observed by your Affiant and Detective Cuevas.  The conversation between LEON and MATA was conducted in Spanish.  The translation and transcription of the recorded telephone call was completed by Detective Cuevas.  The following is the content of the conversation:

LEON:       Yo.

MATA:       Friend.

LEON:       Tell me how it's going.

MATA:       Here, chilling.  Chilling, friend.  How's it going over there?

LEON:       Chilling.  You know just chilling, and tell me.

MATA:       Here grinding.

LEON:       Everything okay?

MATA:       Yea. Everything is okay.  Everything is chill.  Working hard.

LEON:       Okay good, good.  When can you see me?

MATA:       You tell me, so I can explain in person.

LEON:       Exactly, exactly.  Let me see when I can see you.  Don't know.  I have to go to Walmart today here in St. Lucie.

2

MATA:       Let me know what time is good for you.

LEON:       Yea.  When you want.  When you want.  Whatever time.

MATA:       Okay.  I can be there around five.

LEON:       Okay. No problem with that.

MATA:       Okay.  I'll call you when I'm going over there.

LEON:       Okay.

MATA:       Okay. Take care.

5.       Based on your Affiant's experience, and information learned during the course of this investigation, this call concerns MATA and LEON meeting in person to discuss future narcotics activity.  Specifically, MATA and LEON agreed to meet in person to establish future plans for conducting drug transactions.  MATA and LEON agreed to meet in person at the Walmart located at 1850 SW Gatlin Boulevard.

### Controlled Call to LEON and surveillance of LEON – 02/26/19

6.       On February 26, 2019, at approximately 5:00 p.m., your Affiant, FBI/TFO Bolonka, Detective Favale, and Detective Cuevas met with MATA to discuss his upcoming meeting with LEON.  MATA was provided with an audio recording device to be used during his meeting with LEON for the purpose of capturing their conversation.  Prior to leaving for the meeting, MATA and his vehicle were searched for any illegal contraband, narcotics, and/or money with negative results.  MATA was equipped with an audio recording device to complete his meeting with LEON.  MATA departed the rendezvous point followed by a surveillance team and traveled directly to the Walmart located at 1850 SW Gatlin Blvd, Port St. Lucie, Florida.

7.       MATA arrived at Walmart at approximately 4:55 p.m., and parked on the west side of the parking lot.  MATA placed a call to LEON.  LEON told MATA he was on his way

3

and would meet him in the Taco Bell parking lot in front of the Walmart. Law enforcement later confirmed MATA completed the call to LEON by inspecting MATA's cellular telephone. Additionally, Detective Favale heard the call being placed over the recording listening device provided to MATA for the transaction. At approximately 5:10 p.m., a silver BMW bearing Florida tag KDDL35 arrived in the parking lot and parked right next to the MATA. The BMW is registered to Jessenia REYES, who agents had previously identified as LEON's girlfriend. LEON and MATA exited their respective vehicles and met at the rear of the BMW. Agents conducted a drive-by and were able to positively identify LEON.

      8.     The conversation between LEON and MATA was conducted in Spanish. The partial transcription of the meeting was completed by Detective Cuevas. The entire recording was not transcribed due to the length of the conversation and the excessive background noise created by the subject's vehicles. The following are the key portions of the conversation:[1]

| | |
|---|---|
| MATA: | Cousin. Cousin. Here chilling. How's everything going? |
| LEON: | Everything is good, thank god. |
| . . . . | |
| LEON: | What did they say? What did they tell you? |
| MATA: | . . . the weapons. The lawyer told me not to fight that. |
| LEON: | No. Don't fight that. |
| MATA: | . . . I can stay out. |
| LEON: | No. That's not a lie. |
| . . . . | |

---

[1] Portions of the conversation between LEON and MATA were inaudible.

MATA:       I want to start small.

LEON:       No. No. You have to start small.

. . . .

LEON:       Yes. Yes. I'll talk with him. That way, one or two.

MATA:       . . . I feel comfortable with you.

LEON:       Yea. Little by little. I'll talk with him about the situation to give me a
            break. Little by little. I'll talk with them.

. . . .

LEON:       . . . It's a price you won't get around here. Things are hot.

. . . .

LEON:       I can meet you at the gas station on Okeechobee. I'll be there. You tell
            me, two (2) or (3)? . . . I talk clear with you. You were good to me.

. . . .

LEON:       . . . when I have it.

. . . .

LEON:       Yes.

MATA:       . . . price.

LEON:       Like 33 or 34. . . . .

LEON:       If someone has it. Listen . . .

. . . .

LEON:       You're getting skinny.

MATA:       Working. I have to be at work at six. I have to get up at 4:30 a.m.

. . . .

LEON:       I have it. I'll hurry and tell him.

. . . .

LEON:          Okay.  Call me

. . . .

LEON:          Okay.  Call me.

9.      Based on your Affiant's experience, and information learned during the course of this investigation, this conversation is in furtherance of the call placed to LEON earlier in the day.  The purpose of the meeting, as depicted in the transcript above, was to reestablish a drug supplier/drug purchaser relationship between LEON and MATA, and to establish a purchase of cocaine in the near future.

10.     At approximately 5:27 p.m., the meeting was over.  LEON exited the parking lot and traveled east on Gatlin Boulevard.  MATA departed the parking lot and traveled directly back to the rendezvous point followed by the surveillance team.

11.     Agents met with MATA and recovered the recording device and debriefed MATA on the meeting with LEON.  MATA was once again searched for any illegal contraband, narcotics and/or money with negative results.  The following is the information provided by MATA following his meeting with LEON and is consistent with the audio recording, which was reviewed by Detective Cuevas, of the meeting.

12.     MATA said LEON was concerned about his arrest and if he was doing alright. MATA advised LEON all was good and that he was fighting his case.  MATA told LEON he was trying to get back on his feet and needed some cocaine to sell.  MATA said he asked LEON if he could get two (2) to three (3) ounces by the end of the week.  LEON advised MATA he could get the cocaine, but that the cocaine was not his product.  MATA said LEON told him that his (LEON's) source was having problems, so he (LEON) had been using someone else as a

6

source of supply.  MATA said LEON quoted a price of $1050.00 per ounce.  LEON advised MATA not to worry about the money he owed.  LEON told MATA he could make payments on his debt (MATA had previously told your Affiant he was indebted to LEON for $8,000.00 for a half kilogram of cocaine he obtained from LEON prior to his arrest).  MATA said LEON told him he did not have to make a payment toward the debt at the time of the first deal, and that LEON just wanted MATA to get back on his feet.  MATA said LEON told him that once he gets back up and running again, he (LEON) could supply MATA with kilogram quantities of cocaine. MATA said LEON told him to provide ample notice, because he (LEON) would need a couple of days to get the kilos together.

### Controlled Purchase of Cocaine from LEON – 03/01/19

13.     On March 1, 2019, your Affiant, Detective Favale, and other law enforcement officers conducted a controlled buy of two ounces of cocaine from LEON in Port St. Lucie, Florida.

14.     Your Affiant and Detective Favale met with MATA at a predetermined location to make a recorded controlled call to LEON.  At approximately 4:20 p.m., MATA placed a call to LEON.  The call was monitored and the number dialed was observed by your Affiant and Detective Favale.  LEON answered the phone and agreed to meet MATA at the Walmart located at 1850 SW Gatlin Blvd, Port St. Lucie, Florida.  LEON told MATA he (LEON) had the two (2) ounces and that he (LEON) had received a full kilogram of cocaine that day.

15.     At approximately 5:05 p.m., DEA Acting Resident Agent in Charge (A/RAC) Edward Alvey established surveillance in the Walmart parking lot located at 1850 SW Gatlin Boulevard, Port St. Lucie, Florida.  At approximately 5:15 p.m., A/RAC Alvey was joined on surveillance by DEA SA David Melenkevitz and TFO Bob O'Hara.

7

16.     At approximately 5:30 p.m., Detective Favale and your Affiant searched MATA and MATA's vehicle for money, drugs, and contraband with negative results. MATA was provided with an audio recording device to capture the in person meeting with LEON and $2,100.00 of DEA investigative funds to purchase two (2) ounces of cocaine from LEON. MATA departed from the rendezvous point and drove directly to the Walmart followed by the surveillance team. At approximately 5:48 p.m., A/RAC Alvey observed MATA arrive in the Taco Bell parking lot adjacent to the Walmart parking lot. A/RAC Alvey observed MATA park his vehicle on the southeast corner of the Taco Bell parking lot.

17.     At approximately 5:59 p.m., A/RAC Alvey saw a white Dodge Durango bearing Florida Temporary tag CJT4529 driving eastbound through the Walmart parking lot enter the Taco Bell parking lot. Moments later, A/RAC Alvey saw the white Durango park on the southeast side of the Taco Bell parking lot next to MATA's vehicle. At this time, Detective Favale advised the surveillance team that MATA was meeting with LEON. Moments later, A/RAC Alvey observed MATA exit his vehicle and enter LEON's vehicle.

18.     At approximately 6:05 p.m., A/RAC Alvey observed MATA exit LEON's vehicle and return to his vehicle. A/RAC Alvey observed LEON's vehicle depart the Taco Bell parking lot and drive west through the Walmart parking lot. Shortly thereafter, A/RAC Alvey lost sight of LEON's vehicle. A/RAC Alvey observed MATA's vehicle departing the Taco Bell parking lot. A/RAC Alvey maintained constant surveillance on MATA's vehicle until passing it off to DEA SA Kyle Keenan as they traveled northbound on I-95. DEA SA Keenan maintained constant surveillance of MATA's vehicle until he arrived back at the rendezvous point.

19.     At the rendezvous point, Detective Favale recovered a plastic bag containing a white rock/powder like substance and the audio recording device from MATA. The plastic bag

8

containing the white rock/powder like substance had a gross total package weight of approximately 66 grams. Detective Favale conducted a field test of the white rock/powder like substance at the scene and it tested positive for cocaine. MATA and his vehicle were once again searched for money, drugs, and contraband with negative results.

20.     Detective Favale and your Affiant debriefed MATA in reference to the controlled purchase of cocaine from LEON. MATA said LEON arrived in a white Dodge SUV and that he (MATA) got into the front passenger seat of the white SUV. MATA said LEON handed him a large heat sealed plastic bag containing a large white rock. In exchange, MATA advised that he handed LEON the $2,100.00 and LEON asked if it was twenty-one hundred, to which MATA replied yes. LEON told MATA he and his girlfriend just purchased the Dodge Durango a couple of days ago. MATA said that LEON told him to call if he needed anymore cocaine.

21.     The evidentiary items pertaining to this controlled purchase of cocaine were submitted for testing at the Indian River Crime Laboratory to determine the presence or absence of controlled substances. Lab results revealed that the substance related to this controlled purchase has a net weight of 56.56 grams and tested positive for cocaine.

### Controlled Call to LEON – 03/13/19

22.     On March 13, 2019 at approximately 4:23 p.m., your Affiant, FBI/TFO Bolonka, Detective Favale, and Detective Cuevas met with MATA for the purpose of making a recorded and controlled call to LEON to arrange for the purchase of cocaine from LEON. The call was monitored and the number dialed was observed by your Affiant and Detective Favale. During the call, LEON advised MATA he had 2 ounces of cocaine and was ready to do the deal that day. MATA advised LEON he did not have the money and would be ready tomorrow. The conversation between LEON and MATA was conducted in Spanish. The translation and partial

9

transcription of the recorded telephone call was completed by Detective Cuevas. The following is the content of the conversation:

LEON:    Hello.

MATA:    Friend, Friend.

LEON:    Tell me, you're alive.

MATA:    Taking the heat, the pain to live friend.

LEON:    I know.  It's hard.  It's hard.

MATA:    The work is hard, friend.

LEON:    I know, and tell me what's going on?

MATA:    I know. Just getting out . . . just getting out of work.  Want to see if you had something?

LEON:    Okay.  Yes.  Yes.  Okay.  What are you going to need that's going to work?  Two (2) or three (3) now?

MATA:    Yes.  Two.  Two now.

LEON:    Okay.  What time are you going to be done with work?

MATA:    When are you going to be good? Will you be ready tomorrow, or Friday?  When will you be ready over there?

LEON:    No.  Right now if you want?

MATA:    Leave it for tomorrow.  Tomorrow yes, so I can have everything prepared.

LEON:    Okay. No problem. No problem, but yes.

MATA:    Tomorrow at the same time over there?

LEON:    Yes.  Yes.

MATA:    Okay, perfect.

LEON:    Okay take care.

MATA:    If anything I'll call you.

LEON:    Okay friend.

MATA:    Okay.

LEON:    Okay. Bye.

23.    Based on your Affiant's training and experience, and knowledge acquired during the course of this investigation, this call is indicative of narcotics activity. The conversation begins as a general conversation and quickly gets to the point with MATA asking "Want to see if you had something?" This is a generic question commonly used by drug traffickers and is indicative of MATA asking LEON if he had any cocaine available. MATA explained to FBI/TFO Bolonka that there was no need to specify what he was asking for because LEON already knew what MATA was asking due to their ongoing relationship. LEON responds "Okay. Yes. Yes. Okay. What are you going to need that's going to work, two (2) or three (3) now?" The response is indicative of LEON confirming he had cocaine available and questioning MATA as to the quantity of cocaine MATA wanted to purchase. When LEON asks "Two (2) or three (3) now?" he is referencing the quantity of cocaine being two or three ounces. MATA's response – "Yes. Two. Two now" – confirms that the order is for two ounces of cocaine.

## Controlled Call to LEON and
## Controlled Purchase of Cocaine from LEON – 03/14/19

24.    On March 14, 2019, your Affiant, FBI/TFO Bolonka, Detective Favale, and other law enforcement officers conducted a controlled buy of two ounces of cocaine from LEON in Port St. Lucie, Florida.

25.    At approximately 4:50 p.m., law enforcement established surveillance in the Walmart parking lot located at 1850 SW Gatlin Boulevard, Port St. Lucie, Florida. At

11

approximately 4:55 p.m., Detective Favale and your Affiant met MATA at a predetermined location. MATA and MATA's vehicle were searched for money, drugs, and contraband with negative results. MATA was provided with an audio recording and listening device to capture his meeting with LEON and $2,300.00 of DEA investigative funds to purchase (2) ounces of cocaine from LEON. MATA departed from the meet location and drove directly to the Walmart followed by the surveillance team. While traveling to meet with LEON, MATA placed a call to LEON. Detective Cuevas could hear MATA over the listening device speak with LEON about the previously arranged deal for two (2) ounces of cocaine completed on March 13, 2018. Detective Favale later confirmed MATA completed the call to LEON by inspecting MATA's cellular telephone.

26.     LEON and MATA agreed to meet at the same location, which was the Taco Bell/Walmart parking lot located at 1850 SW Gatlin Boulevard, Port St. Lucie, Florida. At approximately 5:10 p.m., Detective Favale advised the surveillance team MATA was traveling to the Walmart/Taco Bell location to meet with LEON. At approximately 5:12 p.m., FBI/TFO Bolonka saw MATA arrive at the Taco Bell parking lot adjacent to the Walmart parking lot. FBI/TFO Bolonka observed MATA park his vehicle on the southeast corner of the Taco Bell and wait for LEON to arrive.

27.     At approximately 5:26 p.m., FBI/TFO Bolonka saw a gray Dodge truck bearing Florida tag APUV91 drive west bound through the Walmart parking lot and enter the Taco Bell parking lot. The Dodge truck is registered to CALDERO and has been identified as being driven by LEON during previous surveillance operations. Moments later, FBI/TFO Bolonka saw LEON park his vehicle on the northwest side of the Taco Bell parking lot next to MATA's vehicle. At this time, Detective Favale advised that MATA was meeting with LEON. LEON

12

and MATA initially met and stood at the rear of LEON's truck for a few minutes engaging in conversation. A few minutes later, FBI/TFO Bolonka saw LEON and MATA get into LEON's truck.

28.     At approximately 5:37 p.m., FBI/TFO Bolonka saw MATA exit LEON's vehicle and return to his vehicle. Moments later, FBI/TFO Bolonka saw LEON's vehicle depart the Taco Bell parking lot and drive east through the Walmart parking lot out of my sight.     FBI/TFO Bolonka then observed MATA's vehicle depart the Taco Bell parking lot.  Your Affiant and FBI/TFO Bolonka maintained constant visual surveillance of MATA's vehicle until returning back to the rendezvous point.

29.     At the rendezvous point, Detective Favale recovered a plastic bag containing a white rock/powder like substance and the audio recording device from MATA.  The package containing the white rock/powder like substance had a gross total package weight of approximately 69 grams.  MATA and MATA's vehicle were once again searched for money, drugs, and contraband with negative results.  Detective Favale conducted a field test of the white rock/powder like substance at the scene and it tested positive for cocaine.

30.     Detective Favale and your Affiant debriefed MATA in reference to the purchase of the two (2) ounces of cocaine from LEON.  MATA said LEON arrived in a gray Dodge truck and met with him at the back of the truck, at which time MATA and LEON discussed future purchases and quantities of cocaine.  Shortly thereafter, MATA and LEON got into LEON's truck to complete the deal.  MATA advised that LEON handed him a large heat sealed plastic bag containing a large white rock.  MATA said in exchange, he handed LEON the $2,300.00 and LEON did not count the money.  MATA stated that LEON told him that if he purchased four (4) ounces of cocaine at a time, he (LEON) would drop the price to $1,000.00 per ounce.  MATA

13

advised that LEON once again told him that the cocaine was not his and the price was "set by his guy."

31.     The evidentiary items pertaining to this controlled purchase of cocaine were submitted for testing at the Indian River Crime Laboratory to determine the presence or absence of controlled substances. Lab results revealed that the substance related to this controlled purchase has a net weight of 56.13 grams and tested positive for cocaine.

32.     On April 1, 2019, your Affiant, Detective Favale, and Detective Cuevas met with MATA. MATA told agents LEON called him on Saturday, March 30, 2019. MATA said LEON called him from a new number and asked MATA if everything was alright. MATA provided agents with the number for LEON's new telephone as the new number used by LEON to contact him. MATA said he told LEON he had been very busy and would reach out to LEON later in the week to "do something." MATA said LEON told him to keep the telephone number and use it from now on and that he (LEON) would talk with MATA soon. MATA advised agents that LEON would typically get a new telephone number every month. MATA showed the incoming call from LEON to your Affiant, Detective Favale, and Detective Cuevas on his cellular telephone.

## Controlled Call to LEON and
## Controlled Purchase of Cocaine from LEON – 04/04/19

33.     On April 4, 2019, your Affiant and other law enforcement officers conducted a controlled buy of two ounces of cocaine from LEON in Port St. Lucie, Florida.

34.     Your Affiant and Detective Favale met with MATA at a predetermined location to facilitate controlled and recorded calls to LEON's new telephone number for the purpose of making a controlled purchase of cocaine. At approximately 4:45 p.m., MATA placed a call to

14

LEON by dialing LEON's new telephone number. The call was monitored and the number dialed was observed by your Affiant and Detective Favale. LEON did not answer on the first call. At approximately 4:55 p.m., MATA placed a second call to LEON. The call was monitored and the number dialed was observed by your Affiant and Detective Cuevas interpreted the call, which was completed in Spanish. LEON answered and agreed to sell MATA two (2) ounces of cocaine. Specifically, LEON said "Everything is good? Just tell me," to which MATA replied "Can I see you today?" LEON said "Yes. Yes. Come down and we can talk" and "Perfect, you call me and there it is cousin." MATA said "the same as last time," and LEON responded "I forgot." MATA said "Two. Around two. The number two" and LEON replied "Okay. That's good. That's good." LEON and MATA then agreed to meet at the same location where the previous deals took place – the Walmart parking lot located at 1850 SW Gatlin Boulevard, Port St. Lucie, Florida.

35.     At approximately 7:20 p.m., law enforcement established surveillance in the Walmart parking lot. Detective Favale and your Affiant met MATA at a predetermined location. MATA and his vehicle were searched for money, drugs, and contraband with negative results. MATA was provided with an audio recording device to capture his in person meeting with LEON and $2,300.00 of DEA investigative funds to purchase (2) ounces of cocaine from LEON.

36.     At approximately 7:38 p.m., MATA departed from the rendezvous point and drove directly to the Walmart followed by the surveillance team. MATA called LEON while he was driving to the meeting location and advised LEON he was on his way. At approximately 7:45 p.m., Detective Favale observed MATA arrive at the Taco Bell parking lot adjacent to the Walmart parking lot. DEA SA LaRocca observed MATA park on the southeast corner of the Taco Bell parking lot and remain in his vehicle.

37.     At approximately 8:00 p.m., Detective Favale observed a dark in color Range Rover bearing Florida tag 943PSP drive through the Walmart parking lot and enter the Taco Bell parking lot.  LEON was identified as the driver and only occupant of the vehicle.  Moments later, Detective Favale observed LEON park his vehicle on the southwest side of the Taco Bell parking lot next to MATA's vehicle.  At this time, Detective Favale advised the surveillance team that MATA was meeting with LEON.  Shortly thereafter, your Affiant observed MATA exit his vehicle and proceed to enter the front passenger door of the Range Rover.

38.     At approximately 8:16 p.m., Detective Favale observed MATA exit LEON's vehicle and return to his vehicle.  Moments later, DEA SA LaRocca observed LEON's vehicle depart the Taco Bell parking lot and drive east through the Walmart parking lot and out of his sight.  Detective Favale observed MATA's vehicle depart the Taco Bell parking lot.  Detective Favale and your Affiant followed MATA's vehicle and maintained constant surveillance on MATA's vehicle until arriving back at the rendezvous point.

39.     At the rendezvous point, Detective Favale recovered a plastic bag containing a white rock/powder like substance and the audio recording device from MATA.  The package containing the white rock/powder like substance had a gross total package weight of approximately 66 grams.  MATA and MATA's vehicle were once again searched for money, drugs, and any contraband with negative results.  Detective Favale conducted a field test of the white rock/powder like substance at the scene and it tested positive for cocaine.

40.     Detective Favale and your Affiant debriefed MATA in reference to the purchase of the two (2) ounces of cocaine from LEON.  MATA said LEON arrived in a Range Rover. MATA said he got into the front passenger seat of LEON's vehicle to complete the transaction. MATA said LEON handed him two plastic bags containing one large white rock in each plastic

16

bag. In exchange, MATA said he handed LEON the $2,300.00 and LEON did not count the money. MATA advised LEON said he doesn't want to do "4, 5, 6" a week, and instead wants to do "1". MATA explained that LEON doesn't want to continuously supply someone with multiple ounces a week, LEON would rather just sell a kilogram one time to limit his exposure. MATA said LEON told him he did not like dealing in ounces of cocaine "because that is how you get caught by the police." MATA advised that LEON stressed he should purchase a least a kilogram of cocaine and have someone sell the cocaine for him. MATA said LEON told him that he (LEON) was going to travel to Puerto Rico in the next 30 to 60 days to meet with his source of supply. MATA said LEON stated that if he could cut out the "middle man" and go directly to the source, the price for a kilogram would be $29,000.00. LEON referred to the middle man as his "uncle," who has yet to be identified.

41. The related evidentiary items pertaining to this controlled purchase of cocaine were submitted for testing at the Indian River Crime Laboratory to determine the presence or absence of controlled substances. The results are pending.

## **Controlled Text Messages and call to LEON and**
## **Controlled Purchase of Cocaine from LEON – 04/10/19**

42. On April 10, 2019, at approximately 12:30 p.m., under the direction of Detective Cuevas, MATA completed a series of text messages to LEON for the purpose of making a one (1) ounce purchase of cocaine from LEON later in the day. The text messages exchanged between MATA and LEON were not monitored live by law enforcement because MATA was at work when the communications took place. However, when law enforcement met with MATA later in the day, photographs of the text messages were captured by Detective Favale and entered into evidence, and Detective Favale was able to verify the text messages were between MATA's

17

cellular phone and LEON's cellular phone. The text messages were completed in Spanish and translated by Detective Cuevas. The following series of incoming/outgoing text messages occurred between MATA and LEON:

MATA:     Cousin, cousin will there be one open pallet for today?

LEON:     Yes.

MATA:     For today around five?

LEON:     Perfect.

MATA:     Okay.

43.     The text messages between MATA and LEON are coded in nature and a common technique utilized by drug traffickers to frustrate law enforcement efforts to identify the criminal activity. MATA explained the term "one open pallet" is coded terminology used to mean "one ounce of cocaine." MATA explained the number "one" is the key term depicting the quantity of cocaine he wants to purchase. MATA explained that since the relationship with LEON is one of an ongoing nature involving purchases of cocaine, LEON is readily aware of what MATA is purchasing, which in this case is cocaine. What is confirmed through the text messages is the quantity of cocaine wanting to be purchased, which in this case was one (1) ounce.

44.     Later on April 10, 2019, your Affiant, FBI/TFO Bolonka, and other law enforcement officers conducted a controlled buy of one ounce of cocaine from LEON in Port St. Lucie, Florida.

45.     Your Affiant, FBI/TFO Bolonka, and Detective Cuevas met with MATA at a predetermined location to facilitate the controlled purchase of the cocaine. At approximately 4:30 p.m., SA Miller and SA Evans of the FBI established surveillance at the Walmart parking lot located at 1850 SW Gatlin Boulevard, Port St. Lucie. At 4:35 p.m., MATA received an

18

incoming call from LEON asking where he was and if he (MATA) was on the way. MATA advised he was on the way. LEON and MATA agreed to meet at the same location of the previous deals, which occurred at the Walmart parking lot located at 1850 SW Gatlin Boulevard, Port St Lucie. The call was monitored and the incoming call number was observed by your Affiant and Detective Cuevas.

46.     MATA and his vehicle were searched for money, drugs, and contraband with negative results. MATA was provided with an audio recording device to capture the meeting with LEON and $1,300.00 of FBI investigative funds to purchase one (1) ounce of cocaine from LEON. At approximately 4:37 p.m., MATA departed from the rendezvous point and drove directly to the Walmart followed by the surveillance team. FBI/TFO Bolonka observed MATA arrive in the parking lot of the Taco Bell located in the Walmart shopping plaza at approximately 4:41 p.m. At approximately 4:53 p.m., FBI/TFO Bolonka saw LEON arrive at the same location driving a Gray Dodge truck bearing Florida tag APUV91. FBI/TFO Bolonka saw LEON park in the Taco Bell parking lot just to the west of MATA. At approximately 4:53 p.m., MATA exited his vehicle and walked over to LEON's vehicle and entered the passenger side of LEON's vehicle. At approximately 4:59 p.m., MATA exited LEON's vehicle and returned to his vehicle. LEON then exited the area. At approximately 5:00 p.m., MATA exited the area and traveled back to the rendezvous point followed by FBI/TFO Bolonka and the surveillance team.

47.     At the rendezvous point, Detective Cuevas recovered a plastic bag containing a white rock/powder like substance and the audio recording device from MATA. The package containing the white rock/powder like substance had a gross total package weight of approximately 30.3 grams. MATA and his vehicle were once again searched for money, drugs,

and contraband with negative results. Detective Cuevas conducted a field test of the white rock/powder like substance at the scene and it tested positive for cocaine.

48.     Your Affiant, Detective Cuevas, ATF SA Gajewski, and FBI/TFO Bolonka debriefed MATA in reference to the purchase of one (1) ounce of cocaine from LEON. MATA advised that LEON arrived in his truck. MATA said he got into the front passenger seat of LEON's vehicle to complete the transaction. MATA said LEON handed him one plastic bag containing one large white rock. In exchange, MATA handed LEON the $1,300.00 and LEON did not count the money. MATA advised that LEON never counts the money. MATA said LEON told him that he (MATA) is moving a "little quicker" and to be careful. MATA asked LEON if he had any guns for sale and LEON asked what kind. MATA told LEON he was looking for a pistol. MATA said LEON told him he had a Springfield .40 caliber with ammunition and LEON asked MATA how much he was looking to spend. MATA said he told LEON he was looking to spend about $300.00. LEON said that he would let MATA know. MATA said LEON appeared to be in a rush, so the deal went quickly. MATA asked LEON about firearms at the direction of law enforcement. MATA had no previous knowledge of LEON dealing in firearms.

49.     The evidentiary items pertaining to this controlled purchase of cocaine were submitted for testing at the Indian River Crime Laboratory to determine the presence or absence of controlled substances. The results are pending.

## CONCLUSION

50.     Based upon the foregoing, your Affiant respectfully submits that there is probable cause that Leeroy LEON knowingly and intentionally distributed cocaine, a Schedule II

20

controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)

(1)(C), as set forth herein.

Respectfully submitted,

Randy Matschner
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on July___ 29 ᵗʰ, 2019

SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE

21

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 19-MJ-076-SMM

**UNITED STATES OF AMERICA**

**v.**

**LEEROY LEON**

        **Defendant.**
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)? _____ Yes ✓ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)? _____ Yes ✓ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY: _____

MICHAEL PORTER
ASSISTANT UNITED STATES ATTORNEY
District Court No.
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:    772-466-0899
Fax:   772-466-1020
Email:  Michael.Porter@usdoj.gov